FILED

2006 Jul-03  AM 07:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **KENNON R. PATTERSON, SR.,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:05-cv-02557-VEH** |
| **COMMUNITY BANCSHARES, INC., REVISED PENSION PLAN,** | ) | |
| | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OF DECISION

The court has before it two motions for summary judgment.  Defendant, Community Bancshares, Inc., Revised Pension Plan ("the Plan") filed a motion (doc. # 7) for summary judgment on March 23, 2006.  Plaintiff, Kennon R. Patterson, Sr. filed a motion (doc. # 16) for summary judgment on April 28, 2006. Pursuant to the court's January 10, 2006 initial order and March 28, 2006 submission order, the motions were deemed submitted, without oral argument, on April 24, 2006 and May 28, 2006, respectively.

### I. Procedural History

Plaintiff Kennon R. Patterson, Sr. commenced this action on December 16, 2005 by filing a complaint in this court alleging wrongful denial of pension

benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.  Patterson and the Plan filed  motions for summary judgment, asserting that no genuine issue of material fact exists and that each is entitled to judgment as a matter of law.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief (doc. # 9) and evidence[1] (doc. # 8) in support of its own motion for summary judgment on March 23, 2006.  On April 13, 2006, plaintiff filed a brief (doc. # 13) and evidence[2] (doc. # 14) in opposition to defendant's motion for summary judgment.  On April 24, 2006, defendant filed a brief (doc. # 15) in reply to plaintiff's opposition.

Plaintiff submitted a brief (doc. #17) and evidence[3] (doc. #18) in support of

---

[1] The defendant submitted the following evidence in support of its motion for summary judgment: affidavit of John J. Lewis, Jr.; final judgment against Kennon R. Patterson, Sr. in USA v. Kennon Patterson, CR-03-B-531-S (N.D. Ala. Feb. 27, 2006); affidavit of William H. Caughran and attached exhibits; affidavit of Mary Anne Arnold and attached exhibits; affidavit of Larry B. Childs and attached exhibits.

[2] The plaintiff submitted the following evidence in opposition: Joint Board Resolution dated 1/27/2003; minutes of the Special Joint Board of Directors Meeting of Community Bank and Community Bancshares; stipulation of facts filed in Patterson v. Cmty Bancshares Benefits Restoration Plan, CV-05-RRA-0366-S on July 26, 2005.

[3] The plaintiff submitted the following evidence in support of its motion for summary judgment: Joint Board Resolution dated 1/27/2003; complaint; minutes of the Special Joint Board of Directors Meeting of Community Bank and Community Bancshares; final judgment against Kennon R. Patterson, Sr. in USA v. Kennon Patterson, CR-03-B-531-S (N.D. Ala. Feb. 27, 2006); letter from Gerald L. Miller to William H. Caughran dated 6/16/2003; letter from Caughran to Patterson, Sr. dated 11/24/2003; letter from Miller to Caughran dated 7/7/2003;

its own motion for summary judgment on April 28, 2006.  On May 15, 2006,

defendant filed a brief and evidence[4] (doc. #19) in opposition to plaintiff's motion

for summary judgment.  On May 30, 2006,[5] plaintiff filed a brief (doc. #20) in

reply to defendant's opposition.  All briefs and evidence have been considered,

and the court concludes that defendant's motion for summary judgment is due to

be granted.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229

---

Participant Notice of Retirement Benefits and attachments dated 12/24/2003 from Mary Anne
Arnold to Patterson; letter from Arnold to Patterson dated 3/25/2004; Community Bancshares,
Inc. Revised Pension Plan, As Amended and Restated 1//1997; letter from Glen M. Connor to
Larry B. Childs dated 9/8/2005; letter from Childs to Connor dated 9/12/2005; letter from
Connor to Childs dated 10/5/2005; letter from Caughran to Patterson dated 10/26/2005;
Participant Notice of Retirement Benefits and attachments dated 9/6/2005 from Arnold to
Patterson.

[4] The defendant submitted the following evidence in opposition: Department of Treasury,
Internal Revenue Service, "Special Rules Under Section 417(a)(7) for Written Explanations
Provided by Qualified Retirement Plans After Annuity Starting Dates," published July 16, 2003.

[5] The court notes that this brief was filed late under the submission order (See Appendix
II to doc. #6).  The court still considered the brief, however, because defendant did not file an
opposition to the court's consideration of the late brief.

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four

4

Parcels of Real Prop, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving

party bears the burden of proof at trial, then it can only meet its initial burden on

summary judgment by coming forward with positive evidence demonstrating the

absence of a genuine issue of material fact; i.e. facts that would entitle it to a

directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once

the moving party makes such a showing, the burden shifts to the non-moving party

to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy

its initial burden on summary judgment in either of two ways.  First, the moving

party may produce affirmative evidence negating a material fact, thus

demonstrating that the non-moving party will be unable to prove its case at trial.

Once the moving party satisfies its burden using this method, the non-moving

party must respond with positive evidence sufficient to resist a motion for directed

verdict at trial.

The second method by which the moving party who does not bear the

burden of proof at trial can satisfy its initial burden on summary judgment is to

affirmatively show the absence of evidence in the record to support a judgment for

the non-moving party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden at trial but does

5

not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[6]

Patterson was chairman, chief executive officer and president of Community Bancshares, Inc. ("Bancshares").  (Lewis Aff. ¶ 3; Complaint ¶ 2.)  Patterson also

---

[6] Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (5th Cir. 1955); Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  See WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

was chairman and chief executive officer of Community Bank, a wholly owned
subsidiary of Bancshares.  (Id.)  In January 2003, Patterson lost his jobs with
Bancshares and Community Bank for multiple reasons, including his alleged
failure to disclose his personal bankruptcy to his fellow directors and his request
for the release of Community Banks' second mortgage on his estate.  (Id. ¶ 4; Joint
Board Resolution dated 1/27/2003; Minutes of Special Joint Board of Directors
Meeting dated 1/27/2003).  Patterson subsequently was indicted and convicted of
conspiracy, bank fraud, false bank entries and false statements on tax returns.  See
U.S.A. v. Kennon Patterson, CR-03-B-531-S (N.D. Ala. Feb. 27, 2006).  On
December 13, 2005, Patterson was sentenced to five years in prison.  Id.

The Community Bancshares, Inc. Revised Pension Plan, As Amended and
Restated January 1, 1997 (the "Plan Document"), states the terms and conditions
for benefit payments under the Plan.  (Caughran Aff. ¶ 3; Ex. A to Caughran Aff.)
Among other things, the Plan Document states that the Bancshares committee
which administers the Plan "may adopt forms for the submission of claims for
benefits in which case all claims for benefits shall be filed on such forms."
(Caughran Aff. ¶ 4; Ex. A to Caughran Aff. § 8.05.)  The committee can set the
rules and procedures for benefit applications; it has the "power and discretion to
construe the Plan" and act on applications; and "[n]o decision of the Committee

7

shall be subject to question by any person except when such decision is arbitrary and capricious." (Caughran Aff. ¶ 4; Exh. A to Caughran Aff. § 8.04.)  The Plan Document contains procedures and limitations designed to facilitate the orderly and equitable administration of the Plan for all of its participants.  (Caughran Aff. ¶ 4; Ex. A to Caughran Aff.)  Patterson approved and signed the Plan Document when he was Chairman, President, and CEO of Bancshares.  (Caughran Aff. ¶ 3; Ex. A to Caughran Aff. at A-65.)

On June 16, 2003, almost five months after Patterson's termination, an attorney representing Patterson, Gerald L. Miller, wrote to the general counsel and secretary of Bancshares, William H. Caughran, and inquired about Patterson's account balances in the Plan and other retirement programs.  (Caughran Aff. ¶ 5; Ex. B to Caughran Aff.)  Regarding the Plan, the letter stated that "it appears . . . that Mr. Patterson is entitled to have his account balances rolled over and paid directly to a self-directed" individual retirement account (IRA), and asked for information regarding "the amount of the balances in his accounts at the present time that would be eligible for rollover distribution."  (Ex. B. to Caughran Aff.) The letter then discussed other retirement issues, including the election to receive the balance of his Employee Stock Ownership Plan (ESOP) benefits in a lump sum.  (Id.)  The letter gave detailed instructions of how the balance should be paid

8

and who the Plan should contact to make arrangements for payments.  (Id.)  After a discussion of a couple of other issues, the letter ended by stating that "Patterson's election to receive his retirement benefits and ESOP account does not waive or release any claim which he might have . . . ."[7]  (Id.)

---

[7] Patterson contends that this letter was a request or written application for benefits.  (Pl.'s Opp. Br. ¶ 10 at 2.)  He further states that "[t]his letter was treated as an application for benefits for the Benefit Restoration Plan and the Employee Stock Ownership Plan, and identical language is used to elect to receive the benefits for the Revised Pension Plan and the Benefit Restoration Plan."  (Id.)  As a citation to this statement, Patterson directs the court to a statement of undisputed facts filed in another suit for benefits, between Patterson and another entity, Community Bancshares, Inc. Benefit Restoration Plan.

Patterson's argument is not supported by the evidence for two reasons.  First, the language of the letter simply does not reflect a request for benefits.  Instead, it is more accurately characterized as an inquiry regarding the pension plan, his account balances, and the options available to Patterson.  In stark contrast, the paragraph regarding his ESOP account makes a specific election and directs the Plan regarding payment of the balances.

Second, the evidence cited by Patterson in support of his contention, the statement of undisputed facts, is specifically limited for purposes of the separate action between Patterson and Community Bancshares Inc. Benefit Restoration Plan, an entity that is not a party to this action. The statement of undisputed facts is signed by Patterson and Community Bancshares, Inc. Benefit Restoration Plan, and is not signed by the Plan, the defendant in this case.  As such, the court will not consider this statement of undisputed facts as evidence in this case.  Even if considered, the evidence does not support the proposition that "identical language was used to elect to receive the benefits for the Revised Pension Plan and the Benefits Restoration Plan," and the Plan explicitly disputes this fact.  (Def.'s Opp. Br. ¶ 5 at 2.)

Moreover, a later letter, mailed on July 7, 2003, stated that Patterson "decided to begin receiving his benefits under the Pension Plan . . . effective July 15, 2003 under the 'Life Only' option.  We trust you will take immediate action regarding this as well as Mr. Patterson's election with regard to his ESOP about which we notified you in my June 16 letter."  (Ex. C to Caughran Aff.)  The language of the June 16 letter, combined with the language of the July 7 letter, read in the light most favorable to Patterson, reveal that the June 16 letter was not a request for benefits as argued by Patterson, but merely an inquiry.  The request for benefits under the pension plan was not until the July 7, 2003 letter, and the evidence reflects that the Plan treated it as such.

Then, on July 7, 2003, Miller sent a second letter to Caughran and reported that Patterson decided against a rollover of his Plan balance and instead wanted to receive a "Life Only" annuity, effective July 15, 2003.  (Caughran Aff. ¶ 7; Ex. C to Caughran Aff.)  The rollover and Life Only Annuity payout methods are options that the Plan offers as alternatives to the automatic annuity payout which begins at normal retirement age if a participant does not make another choice.  (Pl. Ex. J, Revised Pension Plan §§ 4.02-4.07.)  For these optional payout methods, a married participant, such as Patterson, "must obtain the written consent of his Spouse," witnessed by a notary public.  (Id. § 4.02.)  The Plan further provides that a participant who chooses this optional payout method "shall make such election by written request to the [Plan's administrative] Committee on forms provided by the Committee."  (Id. § 4.03.)  The July 7, 2003 letter did not enclose the written consent of Patterson's wife or the benefit election form provided by the Plan.  (See Ex. C to Caughran Aff.;  Pl.'s Ex. G.)

Caughran responded to Patterson in a letter dated November 24, 2003, and notified Patterson that the Plan approved his July 7, 2003 request for pension benefits, that the necessary forms would be forwarded to him, and that benefits would "commence as soon as administratively feasible following our receipt of the completed forms."  (Caughran Aff. ¶ 8; Ex. D to Caughran Aff.)  A month later, on

December 24, 2003, Mary Anne Arnold in Community Bank's Human Resources

Department sent Patterson a "Participant Notice of Retirement Benefits" along

with an application for plan benefits, spousal consent form, and tax-withholding

form.  (Arnold Aff. ¶ 3; Ex. A to Arnold Aff.; Pl. Ex. H.)  This notice and its

enclosures reflected the estimated monthly benefits that were then available to

Patterson under the Plan's various payment forms.  (Ex. A to Arnold Aff.; PL. Ex.

H.)  The benefit illustrations and Method of Payment Election form both stated

that payments would begin on January 1, 2004.  (Id.)  The application included an

acknowledgment that the applicant "may take 30 days to consider whether . . . to

take a distribution and select the form of payment . . ." and if the applicant does

"not make an election at this time, [the] benefits will be deferred."  (Pl.'s Ex. H at

H-10.)  Arnold also included a 2003 Form W-4P Withholding Certificate for

Pension or Annuity Payments, along with instructions that stated "You must

complete this [W-4P] form and return it to the Plan Administrator before payments

can begin."  (Arnold Aff. ¶ 3; Ex. A to Arnold Aff; Pl. Ex. H at H-3, H-23-26.)

As of March 25, 2004, Arnold had not received any response from

Patterson.  Arnold, therefore, sent a reminder dated March 25, 2004, in which she

informed him:

> Your benefit package for the Community Bancshares
> Pension Plan was sent to you on December 24, 2003.
> We have not heard from you yet as to receiving these
> benefits.  If you are interested in receiving the benefits
> from the Community Bancshares Pension Plan please let
> me know and I will send you a new package.

(Arnold Aff. ¶ 4; Ex. B to Arnold Aff.)  Patterson did not respond to Arnold's

March 25, 2004, letter.  (Arnold Aff. ¶ 4.)

Then, on September 8, 2005, more than one year and eight months after the

forms had been sent to Patterson, another attorney representing Patterson, Glen M.

Connor, sent a letter to Larry B. Childs, an attorney for Bancshares, which

enclosed Patterson's signed 2003 pension application materials[8] with the 2003 tax

withholding form.  (Childs Aff. ¶ 3; Ex. A to Childs Aff. at A-11, A-13, A-15, A-

24.)  The letter that accompanied the signed December 2003 pension forms stated

Patterson's request to have his benefits calculated retroactively as of February 1,

2003, or "the first day of the month following Mr. Patterson's retirement."[9]  (Ex. A

to Childs Aff.)  The 2003 forms that Patterson completed and which were enclosed

with his lawyer's September 8, 2005 letter also indicated that Patterson had

---

[8] The starting date of the application, originally designated as January 1, 2004, had been
redacted and in its place was typed February 1, 2003.  (Pl. Ex. K at K-10.)

[9] Although Patterson disputes this fact and states in his opposition brief that he "is not
requesting retroactive benefits but benefits from the date he made his original application in
writing in June 2003," the evidence reflects that is not what Patterson originally requested in
September 2005.

changed his mind again about the way in which he wanted to receive pension

benefits.  (Id.)  While the June 2003 letter inquired about a rollover option, and the

July 2003 letter requested a "Life Only" annuity, the forms accompanying the

September 8, 2005 letter selected a "100% Joint and Survivor with Spouse as

Beneficiary" annuity.[10]  (Id.)

In a letter dated September 12, 2005, Childs, informed Connor that the 2003

application forms signed by Patterson could not be processed because the benefit

calculations were out of date.  (Childs Aff. ¶ 4;  Ex. B to Childs Aff.)  The letter

enclosed current pension application forms, including a 2005 tax-withholding

form.  (Id.; Caughran Aff. ¶ 9; Ex. E to Caughran Aff.)  The forms stated that the

benefits were calculated to begin on October 1, 2005.  (Ex. E to Caughran Aff.)

Patterson did not complete and return the 2005 pension application forms.

(Caughran Aff. ¶ 9.)

On October 5, 2005, Connor replied to Childs' September 12, 2005 letter.

(Ex. C. to Childs Aff.)  The stated purpose of the letter was "to appeal the decision

of the Plan which was communicated by you in your recent correspondence and to

---

[10] The "Life Only" and "Joint and Survivor" payment forms are different types of
annuities.  The Life Only option would provide a higher monthly payment, but the payments
would cease upon Patterson's death; with the 100% Joint and Survivor annuity, the monthly
payments would be lower than under the Life Only form, but the payments would continue in the
same amount to Patterson's wife if she survived him.  (See Ex. A. to Childs Aff. at A-2-8, A-10.)

demand that the Plan calculate the monthly payments due from February 1, 2003

through the current date and make monthly payments as set forth in the November

24, 2003, correspondence."  (Id.)  The letter also stated, in an apparent

contradiction to the stated purpose, that "Patterson originally made his application

for benefits in July 2003" and that he "was not seeking a retroactive benefit, but

merely the benefit from the actual date of the pension application."[11]  (Id.)

On October 26, 2005, Caughran wrote Patterson a letter and informed him

that the Plan "determined that [his] request for retroactive pension benefits . . . be

denied."  (Ex. F. to Caughran Aff.)  The letter detailed that the Plan considered his

attorney's letters of September 8, 2005 and October 5, 2005 as requests on his

behalf to make benefit payments to Patterson retroactive to February 1, 2003.  (Id.)

Caughran outlined the terms of the Plan and stated that those terms  did not

authorize retroactive payments under the circumstances.  (Id.)  The letter also

notified Patterson of his right to appeal the Plan's decision and provided the

proper procedures for such an appeal.  (Id.)  The letter concluded by stating that, if

Patterson chose to commence his pension benefits with an annuity starting date of

---

[11] The court is aware that Patterson disputes that his application was in July 2003, but
instead contends that his first request for benefits and initial application was in June 2003.  The
record reflects, however, that this contention was not communicated to the Plan in the October
2005 letter.

October 1, 2005, he needed to complete the forms sent to him by Arnold on September 6, 2005 and return them no later than December 5, 2005.  (Id.)

Patterson did not file an appeal with the Plan after the October 26, 2005 determination.  Patterson contends, however, that Childs' September 12, 2005 letter was a denial of "Patterson's September 2005 request for benefits when it effectively denied his request to receive pension benefits from the date of his original application by stating that it could not process those forms as the calculations were out of date."  (Doc. #13 at 3, ¶ 23.)  Patterson, therefore, argues that he appealed this denial on October 5, 2005, and "[w]hen [he] received no response from that appeal, he filed this action on December 19, 2005, pursuant to the terms of the Plan."  (Id. at 4, ¶ 26.)

## IV.  Discussion

Before the court can begin to analyze this case, the court must first frame the decision at issue.  In a typical ERISA case, the analysis is straightforward: the plaintiff contends that the Plan wrongfully denied the plaintiff benefits.  This case is not so simple.  It is undisputed that the Plan determined that Patterson was eligible for benefits and that the Plan approved the payment of benefits to

Patterson.[12]  In addition, the lawsuit is not about the amount of benefits Patterson

can receive.  His pension benefits are subject only to actuarial calculations that

take into account the method of payout and the starting date.  (See Ex. A to

Caughran Aff. at A-24.)

The decision Patterson actually complains about is the decision of the Plan

to not begin benefit payments as of the date Patterson requested.  Patterson

contends that his benefits should commence from the time of his "written

application" on June 16, 2003.  The Plan contends that it cannot begin payments to

Patterson until he and his spouse complete and return the required forms,

something that Patterson has not done to the current date.  The Plan argues that the

retroactive payment requested by Patterson would violate the terms of the pension

plan and the Internal Revenue Code.

The Plan makes two arguments in support of summary judgment.  First, the

Plan contends that Patterson failed to exhaust his administrative remedies because

he (1) bypassed the procedures established by the Plan and (2) "prematurely

'appealed' a decision that had not yet been made."  (Def. Br. at 18-23.)  In his

---

[12] Although Patterson's complaint alleges that he "was wrongly denied pension benefits pursuant to the Plan," the factual allegations in the complaint admit that "[t]he Plan agreed pension benefits were payable" and the arguments in his briefs make clear that Patterson does not contend that the Plan has denied him benefits altogether.

16

brief in support of summary judgment, Patterson contends that he followed all procedures in the plan and that his appeal was not premature, but, if the court determines that it was, he should be excused from the exhaustion requirement. (Pl. Br. at 12-14.)  Second, the Plan contends that its decision was not wrong, arbitrary or capricious, or tainted by self-interest.  (Def. Br. at 11-17.)  Patterson disagrees and contends that because the Plan's decision was wrong, he is entitled to summary judgment.  (Pl. Br. at 8-11.)  The court discusses each argument in turn.

### A.  Exhaustion of Administrative Remedies

It is well-established in the Eleventh Circuit that plaintiffs in ERISA cases must normally exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court.  Counts v. Am. Gen. Life and Acc. Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997); Springer v. Wal-Mart Assocs. Group Health Plan, 908 F.2d 897, 899 (11th Cir. 1990); Mason v. Cont'l Group, Inc., 763 F.2d 1219, 1225-27 (11th Cir. 1985).  This requirement applies both to actions based on a breach of contract and to actions based on alleged statutory violations.  See Mason, 763 F.2d at 1225-27; Merritt v. Confederation Life Ins. Co., 881 F.2d 1034, 1035 (11th Cir. 1989).  Exceptions to the exhaustion requirement do exist, however.  District courts have discretion to

17

excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate.  <u>Curry v. Contract Fabricators, Inc. Profit Sharing Plan</u>, 891 F.2d 842, 846 (11th Cir. 1990).

Patterson failed to exhaust his administrative remedies in two different ways.  First, Patterson failed to use the administrative procedures provided by the Plan to obtain payment of benefits.  Under ERISA, failure to use a plan's administrative procedures before filing suit constitutes a failure to exhaust administrative remedies.  <u>See</u> <u>Gaudet v. Sheet Metal Workers' Nat'l Pension Fund</u>, No. 01-0718, 2001 WL 1512305, at *2 (E.D. La. Nov. 28, 2001).  The Plan Document clearly states that "all claims for benefits shall be filed on such forms" adopted by the Plan.  The Plan approved Patterson's request for benefits on November 24, 2003 and informed Patterson that benefits would commence as soon as he returned the Plan's forms.  The Plan sent him these forms on December 24, 2003, and again informed Patterson that he needed to return all the completed forms as soon as possible.

It is undisputed that Patterson failed to return the necessary forms[13] in a timely manner.  By the time Patterson did return the forms on September 8, 2005, a year and eight months after the Plan sent them to him, the calculations were long out of date, and he did not include the required spousal consent.  The Plan sent him updated forms, with updated calculations (which resulted in a substantial increase in benefits per month), but Patterson never returned these forms.

Second, Patterson did not properly appeal the denial of retroactive benefits.  The undisputed evidence reveals that Patterson's purported appeal came before the Plan denied his request for benefits as of the retroactive starting date, and Patterson never submitted an appeal after the actual denial.  Patterson's argument that the September 12, 2005 letter was a denial is unavailing.  The September 12 letter informed Connor that the 2003 forms that Patterson had belatedly returned were out of date and could not be processed.  (Ex. B. to Childs Aff.)  The letter also enclosed updated forms for Patterson to complete and sign.  (Id.)

---

[13] The court rejects Patterson's argument that the forms were not necessary or required because they were not officially adopted by the Plan.  Nothing in the plan requires any sort of formal resolution or other memorialized action by the Plan's administrative committee for the adoption of claims forms.  See generally §§ 4.03 and 8.05.  Section 8.05 of the Plan clearly states that the plan's administrative committee "may adopt forms for the submission of claims for benefits in which case all claims for benefits shall be filed on such forms."  The committee adopted such forms and sent them to Patterson. Any argument to the contrary is unpersuasive.

19

What is more telling, however, is the information that is absent from the September 12 letter.  The letter did not state that Patterson's request for retroactive benefits had been denied and there was not a general denial of his application. (Id.)  The letter also did not contain any of the information required by the Plan Document for a written denial of a benefit request.  The Plan Document mandates that a denial much contain, among other things, the specific reason(s) for the denial, specific references to the pertinent provisions, and an explanation of the Plan's claim review procedures.  (Ex. A to Caughran Aff. at A-35.)

That Patterson treated the September 12 letter as a denial of his request for retroactive benefits does not make it such.  His October 5 "appeal" was not meaningful because the Plan had not yet made the decision as to whether Patterson was eligible for retroactive benefits.  The undisputed evidence shows that the denial for the retroactive start date actually came on October 26, 2005, and contained the required information.  Patterson never appealed this denial.  Instead, he filed suit in this court fifty-four days later, on December 19, 2005.

Patterson's failure to exhaust his administrative remedies and the problems that it creates for the courts are easily seen in this case.  The most obvious example is the date on which Patterson claims he is entitled to begin receiving payment of his pension benefits.  Before litigation, Patterson repeatedly insisted that the Plan

20

begin payments as of February 1, 2003.[14]  Patterson continued with this request up to his purported appeal of the Plan's decision.  However, in his complaint, and throughout his lawsuit, Patterson now contends that payments should begin as of June 2003, the date on which he contends he made his application for benefits. Nowhere in the pre-litigation correspondence between the parties did Patterson request that benefits begin as of this June date.  It is impossible for the court to review a request that was not even considered by the Plan.

The court rejects Patterson's unpleaded contention that exhaustion would have been futile.   The Eleventh Circuit has instructed that the exhaustion requirement may not be suspended absent a "clear and positive showing of futility."  Springer, 908 F.2d at 901.  That the same entity that denied benefits would also be the one to consider an appeal "is insufficient as a matter of law . . . to establish futility."  Id.   Patterson did not offer any evidence of futility.  Instead, Patterson argues that "the Plan did not intend to grant Patterson's request to receive benefits pursuant to his 2003 request" and cites the five month delay between the date he requested benefits and the date the Plan approved the request

---

[14] The court is aware that one letter also contained an internal contradiction and asked for a start date of both February 1, 2003, and that his pension benefits be calculated "from the actual date of his pension application."  Patterson's first request for pension benefits came in July 2003.

and the one month delay before the Plan sent Patterson the necessary forms.  (Pl. Br. in Support of S.J. at 14.)  This argument does not come close to establishing futility, thus excusing Patterson from the exhaustion requirement.  See Springer, 908 F.2d at 901; Curry, 891 F.2d at 846.  As such, summary judgment is due to be granted in favor of the Plan because Patterson failed to exhaust his administrative remedies.

### B.  Substantive Analysis

Even if Patterson exhausted his administrative remedies, the Plan is still entitled to summary judgment.  The court first discusses the different levels of scrutiny in ERISA suits.  The court then addresses the standard that applies in this case, the heightened arbitrary and capricious standard.  Finally, the court applies this standard to the undisputed facts.

### 1.  Three Levels of Scrutiny

The Eleventh Circuit has articulated three different levels of scrutiny in suits involving benefits denials by the administrator of an ERISA plan.  See, e.g., Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003).  First, in circumstances where the plan does not vest the administrator with discretion to determine eligibility for benefits or to construe the terms of the plan, the court reviews the denial decision de novo.  See Firestone Tire & Rubber Co. v. Brush,

22

489 U.S. 101, 115 (1989).  Second, where the terms of the plan provide the administrator with such discretion, its decision to deny benefits is, as a general matter, afforded substantial deference and subjected to an "arbitrary and capricious" standard of review.  See Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1558 n.1 (11th Cir. 1990).

However, where a plan administrator, vested with discretion, has a conflict of interest,[15] this deferential review is adjusted, and a third standard of review is employed.   See id. at 1566-67.  That standard is one of "heightened" arbitrary and capricious review, and affords the administrator's decision to appreciably less deference than it would receive absent the conflict of interest.  Id.   This "heightened" level of scrutiny applies regardless of whether the dispute in question turns on a question of fact, or on the proper construction to be given the plan.  See Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003).

Here, the parties agree that the Plan was both vested with discretion and suffered from a conflict of interest.  As such, it is undisputed that the "heightened" arbitrary and capricious standard applies.  The court next reviews what this standard means in the Eleventh Circuit.

_____

[15] A plan administrator has a conflict of interest where it retains control over the decision-making process, and also pays the relevant benefits out of its own funds.  See Brown, 898 F.2d 1556 at 1566-67.

2.  Heightened Arbitrary and Capricious Review

Under the "heightened" arbitrary and capricious standard of review, the court must apply three steps.[16]  First, under de novo review, the court determines whether the decision to deny benefits was "wrong."  Williams  v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).  A decision is "wrong" when the court disagrees with it.  See id.  If it is not "wrong," then the administrator prevails.  Id.

If the court determines that the decision was "wrong," however, it goes to the second step and determines whether the decision was nevertheless reasonable.  Id.  A decision is reasonable when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).  If the court determines that the administrator's decision was both "wrong" and not reasonable, then the claimant prevails.  Williams, 373 F.3d at 1138.

---

[16] Although the Eleventh Circuit has articulated the steps in several different ways, see, e.g., Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) (integrating steps to determine proper level of scrutiny with remainder of "test," arriving at six-prong analytical framework), where the parties agree that the administrator both possessed discretion in denying benefits and suffered from a conflict of interest, only three steps are needed to resolve the claimant's case.

A more difficult situation arises, however, when the administrator's decision to deny benefits is "wrong," but nevertheless reasonable. Were the decision to be subjected only to an arbitrary and capricious standard of review, it would be entitled to deference, and the administrator would prevail. Id. Under the "heightened" arbitrary and capricious standard, however, something more is required before the administrator may escape liability. See id. In Brown v. Blue Cross & Blue Shield of Alabama, the Eleventh Circuit articulated the parameters of the "heightened" arbitrary and capricious standard, and described what the administrator must show to purge the taint of self-interest:

> that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

898 F.2d at 1566-67.

## C.  Application

### 1.  The First Step: Was the Decision "Wrong"?

As discussed above, the decision at issue is whether the Plan was wrong when it declined to begin paying benefits to Patterson as of June 2003.  The Plan

25

contends that it did not begin paying Patterson benefits because Patterson did not return the required application form, a written spousal consent, and the tax forms until nearly two years after the Plan approved benefits.  When Patterson did return the forms, the calculations were out of date; Patterson was, therefore, given new forms, but he has failed to return these forms to the Plan to the current date.

The Plan argues that it cannot calculate payments as of June 2003 because doing so would violate the terms of the Plan.  Patterson contends that he has not asked for retroactive benefits.  Instead, he argues that the Plan's decision is wrong because it refuses to calculate his benefits as of the date he "applied" for those benefits.  For the reasons that follow, the court agrees with the Plan.

Section 8.05 of the Plan Document outlines the procedures for filing a claim for pension benefits:

> All claims for benefits under the Plan shall be submitted to the Committee who shall have the responsibility for determining the eligibility of any Participant . . . for benefits.  All claims for benefits shall be made in writing and shall set forth the facts which such Participant . . . believes to be sufficient to entitle him to the benefit claimed.  The Committee may adopt forms for the submission of a claim for benefits in which case all claims for benefits shall be filed on such forms.  The Committee shall provide Participants . . .with all such forms.

(Ex. A to Caughran Aff. at A-37.)  Patterson contends that the June 2003 letter qualifies as an application for benefits under the Plan Document, or, at the very

least, that the July 2003 letter was an application for benefits, and that the Plan

treated it as such.  He, therefore, argues that his benefits should be calculated as of

the date of his application, not as of some later date.

Patterson's argument is misplaced.  Although the committee "determined

that [Patterson's] request for pension benefits should be granted," the grant of

pension benefits was explicitly conditioned on "receipt of the completed forms."

(Ex. D to Caughran Aff.)  The condition of receipt of the forms is provided for in

the Plan Document and is the logical method of administering the Plan.  As of the

grant of benefits, Patterson had not provided the vast majority of the information

that the Plan Document specifies participants must provide when they request

benefits.  (Ex. A to Caughran Aff. at A-22, A-24, & A. 37.)  Moreover, what

information Patterson had provided was inconsistent and not in accordance with

the provisions of the Plan Document.

For example, section 4.02 states that unless a participant selects another

payment method, the "Automatic Payment Form" for a married participant (like

Patterson) is a "joint and fifty percent (50%) survivor annuity."  (Id. at A-22.)  For

any other payment method, a participant must "make such an election by written

request to the Committee on forms provided by the Committee" and consent of the

spouse for any change is required.  (Id. at A-24.)  In the letters written by

27

Patterson's attorney, Patterson opted not to receive the Automatic Payment Form. He never, however, provided his wife's consent to a different payment option. Moreover, the type of payment option Patterson's attorney identified in the July 2003 letter was not the same type that Patterson eventually identified on the belated application that he returned in September 2005.

Patterson's contention that he was not informed of any specific deadline for returning the pension application and other forms that were sent to him in 2003 is unavailing. The Plan repeatedly told Patterson that he must complete these forms for payments to begin. The November 2003 letter informed Patterson that his benefit payments would not commence until after he returned the completed forms. The December 2003 correspondence from the human resources department, which enclosed the application and forms, also stated that he should return the completed forms as soon as possible. Moreover, the forms themselves clearly indicate specific deadlines for return, such as allowing "30 days to consider whether or not . . . to take a distribution and select a form of payment." (Ex. A to Arnold Aff. at A-10.) A common sense reading of the application and forms provided Patterson with ample notice that he needed to return the forms in a timely fashion for the Plan to calculate payments according to his selected method of

distribution and for those payments to begin.  Patterson's argument to the contrary is nonsensical.

In addition, Patterson's request for benefits to begin as of February 2003, as argued pre-litigation, or as of June 2003, as argued post-litigation, was a request for retroactive benefits.  Section 4.02 of the Plan Document limits the availability of retroactive benefit starting dates by providing as follows: (1) they "may only be made in the case of a delay which is solely an administrative delay beyond the control of the Participant," and (2) they "may not commence more than ninety (90) days after the written notice pursuant to this Section is given to the Participant." (Ex. A. to Caughran Aff. at A-23.)

Patterson's delay in completing the forms for more than a year and eight months was not "an administrative delay beyond the control of the Participant."  In addition, under the express terms of the Plan Document, payments based on an earlier starting date could not have begun more than 90 days after the Plan sent Patterson the required forms and notices in December 2003.  The documents explicitly informed Patterson regarding this provision in the Plan Document, and Patterson did not return the forms to start his payments in that 90-day period.  As

29

such, the Plan correctly applied the provisions of the Plan Document when it denied Patterson a retroactive starting date.[17]

For all the foregoing reasons, the court concludes that the Plan's decision to not provide Patterson with retroactive benefits was correct.  As such, summary judgment in favor of the Plan is due to be granted.

## 2.   The Second Step: Was the Decision Reasonable?

In the alternative, even if the Plan's decision was wrong, the court determinates that the decision was reasonable.  The court first notes that Patterson has not pleaded, presented any evidence, or even argued that the Plan acted unreasonably when it required him to submit an application for benefits and declined his demand for retroactive benefits.  Instead, his argument focuses solely on his contention that the decision was wrong.  Nonetheless, the court determines, from its review of the evidence, that the Plan's decision, even if wrong, was reasonable.

The Plan Document and forms provided by the Plan to Patterson contain provisions for the orderly processing and administration of benefit claims.  It was

---

[17] In addition, as argued by the Plan in its brief in support of summary judgment, the Internal Revenue Code would not have allowed Patterson to receive a retroactive benefit, see 26 U.S.C. § 417(a)(7)(A)(I)-(ii); 28 C.F.R. Part 1 § 1.417(e)-1(b)(3)(iv), because the Plan Document does not affirmatively provide for retroactive benefits.

reasonable for the Plan to insist that Patterson follow the procedures in the Plan Document.  For instance, it was reasonable for the Plan to insist on the timely return of Patterson's benefit application, especially in light of the Plan Document's requirement that optional methods of payment, like the one selected by Patterson, be made "by written request to the Committee on forms provided by the Committee."  (Ex. A to Caughran Aff. § 4.03.)  It was also reasonable for the Plan to require the written consent of Patterson's wife before beginning payments under an optional payout, as required by the Plan Document.

Moreover, the Plan reasonably interpreted section 4.02 of the Plan Document when it denied Patterson's request for retroactive benefits.  Patterson does not contest that this decision was unreasonable, or even wrong, but instead argues that he was not asking for retroactive benefits.  For the reasons discussed supra, this argument is unavailing.

In addition, Patterson's untimely and inconsistent communications with the Plan demonstrate the reasonableness of the Plan's requirement of timely submission of standardized forms.  Patterson's correspondence with the Plan, through his attorney, communicated numerous payment options: first, in June 2003, Patterson asked about the possibility of "rollover;" second, in July 2003, he stated he wanted a "Life Only" annuity that would have left his wife no benefits at

31

his death; and finally, in September 2005, when he returned the forms, Patterson

selected a 100% Joint and Survivor Annuity.  Patterson's correspondence through

his attorney also insisted on numerous starting dates for his pension benefits: his

attorney's July 2003 letter stated July 15, 2003; a September 2005 letter mentioned

January 2003 as the date for calculating benefits; the signed application that was

belatedly returned in September 2005 said February 2003; and his purported

"appeal" letter in October 2005 stated February 2003.  Then, in this lawsuit,

Patterson demands "benefits commencing on the date that he made his original

application" and "calculated and paid pursuant to his written application made in

June 2003."  All totaled, Patterson has suggested a total of four different starting

dates throughout his communications with the Plan.  As such, the Plan acted

reasonably in requiring Patterson to comply with the terms of the Plan Document

and timely provide the necessary information on forms provided by the Plan.

   3.  The Third Step: Was the Decision Tainted by Self-Interest?

Continuing the alternative analysis, the court also determines that the

decision was not tainted by self-interest, as the Eleventh Circuit uses that term in

the context of ERISA cases.[18]  See Brown, 898 F.2d at 1567-68.  The Plan

---

[18] Again, the court notes that Patterson did not argue in any of his three briefs to this court
that the Plan's decision was tainted by self-interest.  Instead, Patterson argues only that the
decision was wrong.

Document sets certain procedures designed to facilitate the orderly administration of the Plan for all participants.  That the Plan mandated that a former officer follow these procedures only emphasizes the equitable administration of the Plan, and strongly indicates a lack of self-interest.  Moreover, the Plan has persuasively argued that its interpretation of the Plan document was in accordance with ERISA and IRS regulations.  There is nothing inherently unfair about a legal interpretation of the Plan Document and application of that interpretation to Patterson.

## V.  Conclusion

In summary, Patterson's motion for summary judgment is due to be denied. The Plan's motion for summary judgment is due to be granted for two, alternative reasons: (1) Patterson failed to exhaust his administrative remedies; and (2) the Plan's decision was not wrong, unreasonable, or tainted by self-interest.  Because the court finds that no material issues of fact remain, defendant Community Bancshares, Inc., Revised Pension Plan is entitled to judgment as a matter of law as to all claims asserted by plaintiff.

A separate order will be entered.

DONE this the  3rd  day of July, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge